**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HELEN FRAZIER-HILL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-3544 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CHICAGO TRANSIT AUTHORITY | ) | |
| and GEORGETTE HAMPTON, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Helen Frazier-Hill, a bus driver for the Chicago Transit Authority, spent over a decade driving buses up and down the streets of Chicago. She got people where they needed to go in two different types of buses: 40-foot buses, and 60-foot articulated buses. The articulated buses bend in the middle, like a straw.

On the outside, the buses look a lot different. The 60-foot articulated buses are half again as long as the 40-foot buses. That's a lot of extra bus. But from the driver's seat, they're not so different. The steering wheel is the same. So are the seats themselves.

In 2013, Frazier-Hill injured her wrists. Her doctor later diagnosed her with bilateral carpal tunnel syndrome, a condition that can cause numbness, weakness, and pain in the hand and wrist.

Three years later, in 2016, she aggravated her injury. And she blamed the CTA's articulated buses for causing the reinjury. Over the next few years, Frazier-Hill filed at least six accommodation requests. But she didn't ask to stop driving buses. She asked to stop driving the 60-foot *articulated* buses. The CTA denied her requests.

Frazier-Hill responded by suing the CTA and Georgette Hampton, Chairperson of the CTA's Accommodation Review Committee. Frazier-Hill claims that the CTA failed to provide a reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"). She also claims that Georgette Hampton violated her right to equal protection under the Fourteenth Amendment by denying her accommodation requests.

After discovery, the parties filed cross motions for summary judgment. Frazier-Hill moved for summary judgment on her ADA claim, and Defendants moved for summary judgment on both claims. Defendants also filed a motion to strike a report and bar the testimony of Frazier-Hill's rebuttal expert.

For the reasons stated below, Defendants' motion for summary judgment is granted, and Frazier-Hill's motion for summary judgment is denied. Defendants' motion to bar the expert and strike the report is denied as moot.

## Factual Background

The CTA hired Helen Frazier-Hill as a part-time bus operator in October 1998. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 3 (Dckt. No. 165). In 2000, the CTA promoted her to a full-time bus operator. *Id.*

CTA bus drivers must operate buses "over an established route adhering to a predetermined schedule in a safe, efficient, and courteous manner to allow passengers to board, travel, and alight at scheduled stops." *See* Pl.'s Resp. to Defs.' Statement of Additional Facts, at ¶ 4 (Dckt. No. 162); *see also* CTA Position Description, at 1 of 6 (Dckt. No. 159-2, at 87 of 124).[1]

---

[1] Since there are cross motions for summary judgment, there are two sets of facts and two sets of additional facts. In this bounty of facts, some are repeated verbatim. At times, Frazier-Hill admits to a fact, and in another filing denies that exact same fact. *Compare, e.g.*, Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 165) (denying the CTA bus operator duties because "the bus operator job

The CTA's bus fleet consists of 40-foot buses and 60-foot articulated buses. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 8 (Dckt. No. 165).[2] Frazier-Hill has driven both types of buses throughout her career. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 4 (Dckt. No. 143).

On the outside, the buses look different. Articulated buses are 60-feet long, meaning 20 feet longer than the 40-foot buses. *Id.* They have an additional axel. *Id.* They bend in the middle, so the longer buses can still make corners when driving around town.

But on the inside, not much is different, at least from the perspective of the driver. The physical set-up is the same. That is, the steering wheel is the same size in each type of bus. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 165). The driver can customize the position of the steering wheel in each type of bus. *Id.* The steering wheel "can be adjusted telescopically and by tilt to reach similar height and angle." *Id.*

The driver's seats are the same, too. *Id.* The set-up of the driver's controls are "generally the same," with "slight variations based on the bus manufacturer." *Id.*

The punchline is that, if there is any significant physical difference in the set-up for the driver, it's not in the record. For all intents and purposes, the driver's compartment is the same for the 40-foot bus and the 60-foot articulated bus. There is nothing in the record about the equipment being physically different for the driver.

---

description does not identify a bus by either articulated (60 foot) or standard size (40 foot) bus"), *with* Pl.'s Resp. to Defs.' Statement of Additional Facts, at ¶ 4 (Dckt. No. 162) (admitting the exact same fact). When this occurs, the Court deems the fact admitted and ignores the inconsistent denial.

[2] Frazier-Hill denies this entire paragraph but offers no evidence that the CTA's bus fleet doesn't consist of 40-foot and 60-foot articulated buses. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 8 (Dckt. No. 165). Frazier-Hill also denies that articulated buses have an additional axel, but again offers no evidence that this statement is not true. Rule 56.1(e) requires a party to "cite specific evidentiary material that controverts the fact" to dispute a fact. *See* L.R. 56.1(e)(3). Otherwise, "[a]sserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *Id.* Frazier-Hill does largely comply with the rules, but in multiple instances she denies a fact without providing admissible evidence of her own. In those instances, the Court deems the facts admitted.

The parties do present conflicting evidence about whether the operation of a 40-foot bus and a 60-foot articulated bus is the same. According to the CTA, a driver does not have to do anything differently when driving the two types of buses. *See* Defs.' Statement of Facts, at ¶ 8 (Dckt. No. 159) ("[T]here is generally no difference in operation between 40-foot buses and articulated buses, including the amount of force necessary to grip the steering wheel, steering, braking, handling, or otherwise operating either type of bus with the exception of determining pivot points on turns . . . .").

But according to Frazier-Hill, driving an articulated bus caused pain in her wrists because she "used a tighter grip on the steering wheel while driving an articulated bus than on the steering wheel while driving the standard size bus." *See* Frazier-Hill Dec., at ¶ 8 (Dckt. No. 161-1); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 162). She told her doctor that driving an articulated bus requires her to exert extra force. Specifically, in 2016, her doctor wrote a letter to the CTA, reporting that Frazier-Hill had said that "driving the articulated bus exerts additional force on her wrists and hands which in turn puts more stress on her wrists and hands thereby causing aggravation of her symptoms."[3] *See* 10/12/2016 Letter (Dckt. No. 132-5, at 5 of 48); *see also* Pl.'s Statement of Facts, at ¶ 22 (Dckt. No. 132-2).[4]

---

[3] As an aside, it is not obvious why a driver would need to grip the steering wheel of a longer bus more firmly than the steering wheel of a shorter bus. Both buses undoubtedly have power steering. Maybe driving a longer bus is trickier, and requires greater care (*i.e.*, a bigger bus = more can go wrong), which leads the driver to perform differently. In any event, for purposes of the motion for summary judgment, the Court accepts as true Frazier-Hill's statement (in her capacity as a *non*-movant) that she used a tighter grip when driving a longer bus.

[4] One can imagine other potential differences. Maybe bus drivers prefer driving a shorter bus to a longer bus – maybe it's easier to drive. But the record doesn't shed light on that issue. There is nothing in the record about other potential differences. One wonders if there is a difference in the neighborhoods that they serve, or the times of day for the routes, or the pay to the drivers, and so on. But any such differences are not in the record, so the Court will not consider it.

4

The CTA keeps its fleet at seven garages. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 165). Some of these garages do not ordinarily have articulated buses. *Id.* at ¶ 12. Twice a year, bus operators participate in a system-wide pick to select the garage that they will work out of. *Id.* at ¶ 13. Bus operators pick their garage, and thus their bus routes, based on seniority. *Id.*

### *Frazier-Hill's Injury*

In 2013, after 13 years on the job as a full-time bus operator, Frazier-Hill injured her wrists while on duty. *Id.* at ¶ 30. She tripped and fell getting out of the driver's seat of a CTA bus and extended her hands to break her fall. *See* Frazier-Hill Dep., at 111:9-21 (Dckt. No. 132-3, at 17 of 35). In early 2014, a doctor diagnosed her with bilateral carpal tunnel. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 31 (Dckt. No. 165).

Carpal tunnel syndrome occurs when the median nerve, housed in the carpal tunnel and running from the forearm into the palm of the hand, becomes pressed or squeezed at the wrist. *See Carpal Tunnel Syndrome Fact Sheet*, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Carpal-Tunnel-Syndrome-Fact-Sheet (last accessed March 14, 2022). As a result, carpal tunnel can cause numbness, weakness, and pain in the hand and wrist. *Id.*

Because of her injury, the CTA placed Frazier-Hill in its Transitional Return to Work program from December 2013 through September 2014. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 32 (Dckt. No. 165). The Transitional Return to Work program "returns injured employees to work at less than their full-duty assignment for a limited period" after an on-duty injury, with the goal of returning the employee to full duty. *Id.* at ¶ 18. Placement in the

program is temporary.  *Id.* at ¶ 19.  As part of the program, Frazier-Hill did security work for three months, before transitioning back to driving a bus and going to therapy.  *Id.* at ¶ 32.

Frazier-Hill returned to her full-time bus operator position in November 2014.  *Id.* at ¶ 33.  From November 2014 through April 12, 2016, she drove both standard and articulated buses.  *Id.*  She drove a 40-foot bus 80% of the time, and drove a 60-foot articulated bus 20% of the time.  *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 143).

In 2016, Frazier-Hill aggravated her wrist injury.  Following the aggravation, she filed six reasonable accommodation requests.  Frazier-Hill's first and second requests, both filed in 2016, are outside the scope of this lawsuit.  But they laid the foundation for the later requests, and the later denials, so the Court will cover the highlights.

This suit is about two of Frazier-Hill's requests:  her third request in January 2018 and her fourth request in April 2018.  *See* Fourth Am. Cplt., at ¶¶ 16, 21 (Dckt. No. 125); *see also* Pl.'s Mem. in Support of Mtn. for Summ. J., at 8 (Dckt. No. 132-1); Defs.' Reply in Support of Mtn. for Summ. J., at 1 (Dckt. No. 168).[5]

### First Accommodation Request

Again, in April 2016, Frazier-Hill aggravated her wrist injury, causing her to go out of service on April 12, 2016.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 165); Pl.'s Statement of Facts, at ¶ 11 (Dckt. No. 143).  That day, she went to her doctor, Dr. Alfonso Mejia.  *See* 4/12/16 Clinic Progress Note (Dckt. No. 164-1, at 15 of 22).  Dr. Mejia observed "likely recurrent symptoms of bilateral carpal tunnel syndrome" and said that Frazier-Hill complained of "left-handed numbness and tingling" as well as right-sided burning.  *Id.*  He

---

[5]  The parties focus on the 2018 requests, stating that the relevant period begins with the denial of her January 2018 request.  *See* Pl.'s Mem. in Support of Mtn. for Summ. J., at 10 (Dckt. No. 132-1); Defs.' Reply in Support of Mtn. for Summ. J., at 1 (Dckt. No. 168).  Since the parties limit Frazier-Hill's failure to accommodate claim to the 2018 requests, this Court will do so, too.

prescribed occupational therapy, vitamin B6, and nerve gliding exercises, and told her to take off work for two weeks. *Id.* at 15–16.

Later in April 2016, an occupational therapist evaluated Frazier-Hill. The therapist determined that Frazier-Hill had "difficulty completing the following activities independently: using the computer, writing, carrying/lifting > 10 lbs, sleeping and driving." *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 167).

In May 2016, Frazier-Hill completed a CTA Accommodation Request form, requesting to not drive articulated buses. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 35 (Dckt. No. 165); *see also* May 2016 Request for Reasonable Accommodation (Dckt. No. 159-3, at 18 of 64). On her request form, Frazier-Hill stated that she needed the accommodation because "the articulated bus cause [sic] problems for my hands and wrist pain bilateral carpal tunnel." *See* May 2016 Request for Reasonable Accommodation.

In addition to the request form, Frazier-Hill submitted a "Consent to Return to Work/School" note from her doctor, Dr. Mejia. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 14 (Dckt. No. 143). The doctor stated that she could return to work on June 6, 2016 with the restriction of not driving articulated buses. *Id.* The Consent form didn't provide much detail: "The patient can return to work 6/6/16 with restrictions of no driving articulated buses. This was for a bilateral carpal tunnel syndrome recurrence." *See* Consent to Return to Work/School (Dckt. No. 132-4, at 19 of 69).

The CTA has an Accommodation Review Committee ("ARC") that reviews requests for workplace accommodations. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 165). The ARC consists of three voting members: a representative from Human Resources, a representative from ADA Compliance, and a manager from the employee's area. *Id.* at ¶ 21.

Defendant Georgette Hampton, Senior Manager of Human Resources Benefit Services, chairs the ARC as the representative from Human Resources. *Id.* at ¶ 6. A majority of the ARC must vote to grant or deny an accommodation. *Id.* at ¶ 21.[6]

When evaluating accommodation requests, the ARC reviews all documentation related to the request and votes to grant or deny the request unless they need additional information. *Id.* at ¶ 23. If an employee submits a duplicative request for the same type of accommodation while the initial request is pending, the ARC continues to review the initial request, but considers any new information submitted with the subsequent request. *Id.* at ¶ 24.

The ARC evaluated Frazier-Hill's first accommodation request in several meetings between June and October 2016. During a meeting on June 23, 2016, ARC requested more information from Frazier-Hill's doctor. *Id.* at ¶ 39. The ARC also stated that it needed to consult with the CTA's Bus Training and Instruction Department and the Safety Department, and needed to review other documents. *Id.*

The ARC learned from the CTA's Bus Training and Instruction Department that "there is no difference between articulated buses and other CTA bus models." *Id.* at ¶ 40.

Frazier-Hill takes issue with the notion that there are no differences between the buses. The denial is cryptic: "No try out on the articulated bus." *Id.* She then takes issue with the conclusion of the CTA's expert, who "did not attempt to measure the amount of force need [sic] to grip a steering wheel on either an articulated bus or a standard size bus." *Id.*

---

[6] Frazier-Hill objects to paragraphs 20 and 21, stating "no line numbers for Exh. N." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 20–21 (Dckt. No. 165). Local Rule 56.1 does not require line numbers for each exhibit. Instead, it requires a citation "to the specific evidentiary material, including the specific page number." *See* L.R. 56.1(d)(2). Defendants cite to the exhibit and page number, and that suffices. The key question is simple: when looking for the evidence, can the opposing party and the district court find it? And here, the Court can find it.

But perhaps more importantly, Frazier-Hill does not call into question what the Bus Training and Instruction Department told the ARC. That is, she does not offer evidence suggesting that the Department did not tell the ARC that there is "no difference" between the buses. *Id.* She disagrees with the substance of what was said, but not the fact of what was said. *Id.*

Additionally, the ARC twice requested information from Frazier-Hill's doctor. *Id.* at ¶¶ 41–43. Specifically, the ARC asked Dr. Mejia to explain what aspect of Frazier-Hill's carpal tunnel prevented her from driving an articulated bus. *Id.* In response, Dr. Mejia stated that he based his recommendation on Frazier-Hill's own statements. *Id.* at ¶ 44. Frazier-Hill told Dr. Mejia that articulated buses put more force on her wrists and hands, aggravating her carpal tunnel. *Id.*. But Dr. Mejia didn't review technical specifications of the CTA's bus fleet or otherwise verify Frazier-Hill's statements about articulated buses. *Id.* at ¶ 45. Dr. Mejia took what Frazier-Hill told him, and made a recommendation based on her word alone. Once again, Frazier-Hill disputes Dr. Mejia's response. But she doesn't offer any evidence that Dr. Mejia didn't say that. *Id.*

At some point, the CTA received an orthopedic note from Dr. Mejia. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 167). The parties do not say if the CTA presented this note to the ARC. The note was dated September 15 and 16, 2016. *See* 9/15/2016 Orthopedic Note (Dckt. No. 164-2, at 6 of 22). In the note, Dr. Mejia explained that Frazier-Hill's carpal tunnel was "not very symptomatic," but the week prior she had "an episode of left hand numbness." *Id.* The note also stated that Dr. Mejia wanted to send Frazier-Hill to occupational therapy for bilateral flexor tendinitis, a separate medical condition. *Id.* Dr. Mejia

stated that "[i]f the occupational therapy sessions go well," Frazier-Hill could return to work "but with the restriction of not driving articulated buses."  *Id.*

On October 28, 2016, the ARC denied Frazier-Hill's May 2016 accommodation request, concluding that her "medical documentation submitted does not substantiate" the accommodation request.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 165).

Three days later, on October 31, 2016, the CTA received a Work Status Report dated October 27, 2016, stating that Frazier-Hill could return to work on October 31, 2016, with the restriction of "driving non-articulated buses only."  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 167); *see also* 10/27/2016 Work Status Report (Dckt. No. 164-2, at 3 of 22).  The report also stated that her carpal tunnel was "asymptomatic," but "not resolved."  *See* 10/27/2016 Work Status Report.

### Second Accommodation Request

While the CTA considered her first request, Frazier-Hill submitted a second accommodation request on September 20, 2016.  *Id.* at ¶ 37.  She requested to not drive articulated buses, stating her "B/L carpal [tunnel] syndrome and tenosynovitis in both wrists" required the accommodation.  *Id.*; *see also* September 2016 Request for Reasonable Accommodation (Dckt. No. 159-3, at 20 of 64).

The parties do not explain what happened to this second accommodation request and whether the ARC denied it.  But again, the omission does not matter because the denial of the second accommodation request in 2016 is not the basis for a claim (except as background).

### Return to Work

In November 2016, Frazier-Hill returned to work.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 49 (Dckt. No. 165).  Before returning, Dr. Rolando Garces – a doctor at CTA's third-

10

party administrator, Concentra – examined Frazier-Hill on October 31, 2016. *Id.* at ¶ 48. Dr. Garces cleared Frazier-Hill to return to work without any medical restrictions. *Id.* This clearance without restrictions occurred only four days after Frazier-Hill's doctor, Dr. Mejia, stated that Frazier-Hill could only return to work with the restriction of driving non-articulated buses. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 167); *see also* 10/27/2016 Work Status Report (Dckt. No. 164-2, at 3 of 22).

Frazier-Hill got behind the wheel from November 2016 until September 29, 2017. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 49 (Dckt. No. 165). But she did not drive articulated buses. *Id.* Frazier-Hill used her seniority to pick routes that only required driving 40-foot buses. *Id.*

### *Carpal Tunnel Surgery*

Then, in late September 2017, Frazier-Hill stopped working again, this time for surgery. On September 29, 2017, Dr. Mejia performed a successful carpal tunnel release and trigger thumb release surgery on Frazier-Hill. *Id.* at ¶ 50.

During a carpal tunnel release surgery, a surgeon makes a small incision on the wrist to access the carpal ligament and carpal tunnel. *See, e.g.*, Operative Reports (Dckt. No. 132-6, at 73–74 of 76). The surgeon then cuts the carpal ligament to enlarge the carpal tunnel. *Id.*[7]

After surgery, Frazier-Hill showed improvement in her carpal tunnel. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 50 (Dckt. No. 165). She received short-term disability payments

---

[7] Neither party discusses Frazier-Hill's trigger thumb as a potential disability. As an aside, trigger thumb is a condition where the A1 pulley, a ligament at the base of the finger, becomes inflamed and thickened, making it harder for the flexor tendon to glide through. *See, e.g.*, *Trigger Finger*, OrthoInfo, https://orthoinfo.aaos.org/en/diseases--conditions/trigger-finger/ (last accessed March 14, 2022). Trigger thumb causes pain, stiffness, and locking or catching when bending a finger. *Id.* In the trigger finger release surgery, a surgeon makes an incision directly over the A1 pulley, dissecting the pulley to remove adhesions and allow the flexor tendon to move freely. *See, e.g.*, Operative Reports (Dckt. No. 132-6, at 73 of 76).

from the CTA from late September 2017 until mid-November 2017 while she recovered. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 167).

In December 2017, the CTA placed Frazier-Hill into something called the "Area 605-temporary medical disability" as she continued to recover from her surgery. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 51 (Dckt. No. 165). Area 605 is an employment leave status for union employees, like Frazier-Hill, who the CTA determines are medically unfit to perform the essential functions of their job classifications due to injury or illness. *Id.* at ¶ 14. An employee in Area 605 because of a non-duty injury (like Frazier-Hill) can remain in Area 605 for up to two years from their last day worked, or three years with supporting medical documentation. *Id.* at ¶ 16.

When the CTA placed Frazier-Hill in Area 605, they also sent her a letter stating that she "was placed into Temporary Medical Disability (TMD)/Area 605 because [her] present medical condition" did not meet the requirements of her position. *Id.* at ¶ 51. The letter also informed Frazier-Hill that if she believed that a reasonable accommodation could allow her to return to active employment status, she could complete a set of enclosed forms and return them to the ARC. *Id.*

### Third Accommodation Request and Grievance

Frazier-Hill wanted to return to active employment status. After receiving the letter, she got a Work Status Report from her doctor stating that she could return to work with a temporary restriction – not driving articulated buses – as early as January 15, 2018. *Id.* at ¶ 52. The letter stated that Frazier-Hill would have the temporary restriction in place until March 2018. *Id.*

With this Work Status Report in hand, she submitted an accommodation request form, her third accommodation request, on January 9, 2018, asking "not to drive articulated bus[es]."

*Id.*  Frazier-Hill said that she needed the accommodation due to her carpal tunnel release surgery and attached her Work Status Report.  *Id.* at ¶ 56.

Apparently, Frazier-Hill did not want to wait for the ARC to deliberate.  On January 19, 2018, just four days after filing her accommodation request, she filed a grievance with the CTA. *Id.* at ¶ 54; *see also* Grievance (Dckt. No. 159-4, at 2 of 38).  The grievance stated that Frazier-Hill wanted to return to work with the restriction of not driving articulated buses.  *See* Grievance. She noted in her grievance that the ARC was still reviewing her January 2018 accommodation request.  *Id.*

In February, the CTA denied both Frazier-Hill's grievance and her 2018 accommodation request.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 55, 57 (Dckt. No. 165).

In denying her accommodation request, the ARC stated that "the Committee has determined that the physical demands of driving an articulated bus are no different than the physical demands of driving any other CTA bus.  As such, the accommodation [Frazier-Hill sought] would not serve to alleviate [her] current medical condition . . . ."  *Id.* at ¶ 57.  They based this decision on Frazier-Hill's request and supporting documentation (the Work Status Report) in addition to information from CTA's Bus Training and Instruction Department about 40-foot buses and 60-foot articulated buses.  *Id.* at ¶ 58.

### Fourth Accommodation Request

A few months later, Frazier-Hill tried again.  In April 2018, she filed another accommodation request form, her fourth since 2016, requesting "to drive standard buses" so that she could "continue earing [sic] a living."  *Id.* at ¶ 59; *see also* April 2018 Request for Reasonable Accommodation (Dckt. No. 159-4, at 14 of 38).

She attached to the request an April 2018 Concurrent Disability and Medical Leave Statement from Dr. Mejia. *See* April 2018 Request for Reasonable Accommodation (Dckt. No. 159-4, at 14 of 38). The statement from Dr. Mejia said that Frazier-Hill could return to work in April 2018 and drive standard buses, but could not drive articulated buses. *See* April 2018 Concurrent Disability and Medical Leave Statement (Dckt. No. 165-5, at 4 of 51). This restriction had an "unknown" end date. *Id.*

The ARC reviewed this accommodation request and once again denied it. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 60 (Dckt. No. 165). Once again, in the decision letter, the ARC stated that the "physical demands of driving an articulated bus are no different than the physical demands of driving any other CTA bus." *Id.*

Also in April 2018, an occupational therapist evaluated Frazier-Hill yet again. *See* Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 164). The therapist stated that Frazier-Hill presented with "deficits in AROM [probably meaning Active Range of Motion] (end range composite grasping, strength, soft tissue restrictions.[)]" *Id.* The deficits limited Frazier-Hill's "ability to complete the following essential B/IADLs [probably meaning Basic / Instrumental Activities of Daily Living]: opening a tight jar, carrying a shopping bag, washing her back; using a knife to cut food." *Id.*

### *Fifth and Sixth Accommodation Requests*

In 2019, Frazier-Hill filed two more requests to not drive articulated buses. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 61, 64 (Dckt. No. 165). They are outside the scope of this lawsuit. The CTA closed both request files due to Frazier-Hill's failure to engage in the interactive process. *Id.* at ¶¶ 63, 66.

14

### The Separation

The following year, her tenure with the CTA came to an end.  On September 28, 2020, the CTA administratively separated Frazier-Hill from her employment.  *Id.* at ¶ 78.  The CTA sent Frazier-Hill a letter a few weeks later explaining that "[i]n accordance with the collective bargaining agreement (CBA) between Chicago Transit Authority and the Union representing you, your authorized time in an inactive status [Area 605] has expired."  *Id.*

## Procedural History

Meanwhile, during the years when she sought accommodations, Frazier-Hill also complained to state and federal agencies.

On July 16, 2016, Frazier-Hill filed a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Committee ("EEOC").  *Id.* at ¶ 79.  She alleged that she was "subjected to unequal terms and conditions" when she didn't receive payment for medical leave.  *Id.*; *see also* Cplt., at 8–9 of 12 (Dckt. No. 10).  She also alleged that the CTA discriminated against when she received written warnings, and harassed when a Senior Manager hung up on her.  *See* Cplt., at 9–10 of 12.  The 2016 charge did not allege that the CTA had failed to accommodate a disability.

The EEOC responded by issuing a Dismissal and Notice of Rights letter on March 8, 2018.  *Id.* at 7 of 12.  According to the notice, Frazier-Hill had 90 days from receiving the notice to sue based on the IDHR and EEOC charge.  *Id.*

The next day, Frazier-Hill filed a second charge.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 79 (Dckt. No. 165).  She filed the second charge solely with the EEOC, claiming discrimination based on disability and that the CTA had failed to provide a reasonable accommodation.  *Id.*

15

While that second charge was pending, Frazier-Hill filed this lawsuit on May 18, 2018. So she filed suit less than 90 days after receiving the March 8, 2018 notice. Frazier-Hill filed suit *pro se*, but Judge Castillo (this Court's predecessor, before reassignment) appointed her counsel. *See* 1/29/2019 Order (Dckt. No. 9).

On April 25, 2019, Frazier-Hill received a Dismissal and Notice of Suit Rights letter for the second charge. *See* Fourth Am. Cplt., at ¶ 30 (Dckt No. 125). Frazier-Hill amended her complaint (a few times), ultimately adding her second charge. *See* First Am. Cplt. (Dckt. No. 12); Second Am. Cplt. (Dckt. No. 19); Third Am. Cplt. (Dckt. No. 77); Fourth Am. Cplt.

Frazier-Hill's Fourth Amended Complaint includes two claims and focuses solely on whether the CTA provided a reasonable accommodation. *See* Fourth Am. Cplt. (Dckt. No. 125).

Count I alleges that the CTA discriminated against Frazier-Hill based on her disability in violation of the ADA. *Id.* at ¶¶ 34–44. Specifically, Count I alleges that the CTA failed to make reasonable accommodations and failed to engage in an interactive dialogue with Frazier-Hill about accommodations. *Id.*

Count II is a claim against Hampton, alleging that she violated Frazier-Hill's right to equal protection under the Fourteenth Amendment. *Id.* at ¶¶ 45–54. Frazier-Hill claims that when Hampton denied the accommodation requests, she denied Frazier-Hill equal protection of the law. *Id.*

After discovery, Frazier-Hill and Defendants later filed cross motions for summary judgment. Frazier-Hill moved for summary judgment on Count I, meaning her ADA claim against the CTA. *See* Pl.'s Mtn. for Partial Summ. J. (Dckt. No. 132). Defendants moved for summary judgment on both claims. *See* Defs.' Mtn. for Summ. J. (Dckt. No. 144).

Along the way, Defendants also moved to bar the testimony of Frazier-Hill's rebuttal expert, Dr. Mercurio, and to strike her report. *See* Defs.' Mtn. to Strike Report & Rebuttal Expert (Dckt. No. 153). Defendants argue that Dr. Mercurio is not qualified and used an unreliable methodology. *Id.*

### Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute about any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

When parties file cross motions for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was filed. *See Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017). The Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcantante v. City of Chicago*, 657 F.3d 433, 439 (7th Cir. 2011); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## Analysis

Frazier-Hill brings two claims against the CTA and Georgette Hampton, the Chairperson of the Accommodation Review Committee. The first claim is a failure to accommodate claim under the ADA against the CTA (only). The second claim is an equal protection claim against Hampton (only).

The parties filed cross motions for summary judgment on the ADA claim. Defendants moved for summary judgment on the equal protection claim. The Court will take them up in that order.

## I.      Failure to Accommodate under the ADA (Count I)

The first claim is under the ADA. Frazier-Hill alleges that the CTA failed to accommodate her request in 2018 to drive only 40-foot buses, and not 60-foot articulated buses.

"The ADA provides that a covered employer shall not 'discriminate against a qualified individual with a disability because of the disability of such individual.'" *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005) (quoting 42 U.S.C. § 12112(a)). An employer must "mak[e] reasonable accommodations to the known physical or mental limitations of an

18

otherwise qualified individual with a disability who is an applicant or employee," unless the employer can show that "the accommodation would impose an undue hardship on the operation of the [employer's] business." *See* 42 U.S.C. § 12112(b)(5)(A).

"Thus, the ADA requires employers to reasonably accommodate the limitations of its disabled employees." *See Sears, Roebuck & Co.*, 417 F.3d at 797. The duty to reasonably accommodate a disabled employee may require a reassignment to a vacant position. *See* 42 U.S.C. § 12111(9)(B).

To establish a claim for failure to accommodate, an employee must show: "(1) the employee was a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability." *See Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021) (citing *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019)). "If the plaintiff establishes these elements of the prima facie case, the burden shifts to the employer to prove that the requested accommodation would impose an undue hardship." *Id.* (citing *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 850 (7th Cir. 2019)).

The ADA applies to a "qualified individual" with a "disability." *See* 42 U.S.C. § 12112(a). A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *See* 42 U.S.C. § 12111(8). The latter part of that definition is not in dispute. The parties agree that Frazier-Hill could perform the essential functions of her position at the CTA.

Instead, the key question is whether Frazier-Hill had a disability within the meaning of the ADA. The statute defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of

such an impairment; or (C) being regarded as having such an impairment." *See* 42 U.S.C.
§ 12102(1).

Frazier-Hill argues that she was disabled under the first part of that definition, meaning
that she had a "physical or mental impairment that substantially limits one or more of the major
life activities . . . ."[8] *See* 42 U.S.C. § 12102(2). She argues that she had a physical impairment –
bilateral carpal tunnel – that substantially limits the major life activities of working, reaching,
and lifting.[9] *See* Pl.'s Mem. in Support of Mtn. for Summ. J., at 3 (Dckt. No. 132-1); Pl.'s Reply
in Support of Mtn. for Summ. J., at 3 (Dckt. No. 161); Pl.'s Resp. to Defs.' Mtn. for Summ. J., at
4 (Dckt. No. 163).

The statutory phrase in question – a "physical or mental impairment that substantially
limits one or more of the major life activities of such individual" – has three components. *See* 42
U.S.C. § 12102(2). A plaintiff must show (1) an impairment (2) that substantially limits (3) a
major life activity. *Id.* The inquiry is "whether the plaintiff's condition constitutes an
impairment under the ADA, whether the activity upon which the plaintiff relies constitutes a
major life activity, and whether the impairment substantially limited the performance of the

---

[8] Frazier-Hill expressly states that "[t]he Court need not consider whether Plaintiff was 'regarded as'
disabled . . . ." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 4 (Dckt. No. 163). Additionally, she does
not make any arguments that she has a "record of" a disability. This is understandable, given that a
"record of" a disability means that the person has a history of, or has been misclassified as having, a
mental or physical impairment that substantially limits one or more major life activities, even though the
person does not currently have a disability. *See* 29 C.F.R. § 1630.2(k). Frazier-Hill claims that she still
has carpal tunnel.

[9] Frazier-Hill also argues that her carpal tunnel limits the major life activity of sleeping, but later
abandons this argument, stating she was *only* limited in working, reaching, and lifting. *See* Pl.'s Mem. in
Support of Mtn. for Summ. J., at 3 (Dckt. No. 132-1); Pl.'s Reply in Support of Mtn. for Summ. J., at 3
(Dckt. No. 161); Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 4 (Dckt. No. 163). She did not allege her
carpal tunnel limited sleeping in any of her complaints. Since Frazier-Hill abandoned sleeping as a major
life activity, this Court does not consider whether Frazier-Hill produced evidence that her carpal tunnel
limits sleeping.

major life activity." *See Sears, Roebuck & Co.*, 417 F.3d at 797 (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)).

Two of the three components are not at issue here. Carpal tunnel is an impairment under the ADA. *See, e.g.*, *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002), *superseded in part by* Pub. L. 110-325, 122 Stat. 3553 (2008). And working, reaching, and lifting are major life activities. *See* 29 C.F.R. § 1630.2(i)(1)(i). Thus, the question is whether Frazier-Hill came forward with sufficient evidence to support a verdict in her favor by a reasonable jury that her carpal tunnel *substantially limited* her ability to work, reach, or lift.

The key verb in the phrase is "limit[]" – the impairment must substantially limit the activity. *See* 42 U.S.C. § 12102(2). A plaintiff does not have to prove that the disability prevented the activity altogether. To substantially limit an activity, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity." *See* 29 C.F.R. § 1630.2(j)(1)(ii).

Instead, the impairment only needs to "substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population." *Id*. "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." *See* 29 C.F.R. § 1630.2(j)(1)(i).

Not all impairments qualify as a "disability" within the meaning of the statute. *See Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005); 29 C.F.R. § 1630.2(j)(1)(ii). And the existence of a medical condition, on its own, does not establish a disability. *See, e.g.*, *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 607 (7th Cir. 2012). Still, the definition of disability is "construed in favor of broad coverage." *See* 42 U.S.C. § 12102(4)(A).

"Courts determine whether an individual has an ADA disability 'as of the time the employment decision was made.'" *Corrales v. Elite Cable Commc'ns, LLC*, 2021 WL 1978309, at *3 (N.D. Ill. 2021) (quoting *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000)). The question is whether Frazier-Hill was disabled when the CTA denied her accommodation requests in 2018. The question is not whether Frazier-Hill was disabled in 2016, or whether she is disabled now.

Frazier-Hill argues that her carpal tunnel substantially limited her ability to work, reach, and lift. She points to a collection of material in the record, including doctor's notes about her work restrictions and about her pain, occupational therapy reports, and her admission to Area 605. *See* Pl.'s Mem. in Support of Mtn. for Summ. J., at 2–4; Pl.'s Reply in Support of Mtn. for Summ. J., at 3–6 (Dckt. No. 161); Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 1–6 (Dckt. No. 163). However, none of this evidence shows that Frazier-Hill's carpal tunnel substantially limited her in a major life activity in 2018.

First, Frazier-Hill argues that her carpal tunnel substantially limited the major life activity of working (*i.e.*, driving a bus). But Frazier-Hill is not arguing that she could not drive buses. She acknowledges that she could drive 40-foot buses, so her condition did not substantially limit her ability to work.

"When a plaintiff claims that [s]he is substantially limited in the major life activity of working, [s]he must show that [s]he is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *See Delgado v. Certified Grocers Midwest, Inc.*, 282 F. App'x 457, 460 (7th Cir. 2008) (cleaned up); *see also Carothers v. County of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015); *Povey v. Jeffersonville*, 697 F.3d 619, 923 (7th Cir. 2012);

29 C.F.R. § 1630 Appendix.  Notice the breadth of the terminology.  The impairment must limit the ability to perform a "class" of jobs or a "broad range of jobs in various classes."  *Delgado*, 282 F. App'x at 460.[10]

"[T]he perceived inability to perform a single job is insufficient to show disability under the ADA."  *Smith v. Union Pac. R.R.*, 2018 WL 1293228, at *9 (N.D. Ill. 2018) (Dow, J.).  "The

---

[10]  In *Powers v. USF Holland, Inc.*, 667 F.3d 815 (7th Cir. 2011), the Seventh Circuit relied upon the then-current version of the regulation when discussing the major life activity of working.  The Seventh Circuit stated:

> To be substantially limited in the major life activity of working means that a claimant is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(I).  A class of jobs includes "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within [the employee's] geographical area . . . ."  29 C.F.R. § 1630.2(j)(3)(ii)(B).  A broad range of jobs includes "the number and types of other jobs not utilizing similar training, knowledge, skills or abilities within that geographical area."  29 C.F.R. § 1630.2(j)(3)(ii)(C).

*Id.* at 820.  Since then, the EEOC has amended the regulation so that it no longer includes those particular provisions, meaning that the current language does not refer to a "class of jobs or a broad range of jobs in various classes."  *Compare Powers*, 667 F.3d at 820, *with* 29 C.F.R. § 1630.2(j)(3).  Still, the statutory text has not changed.  Needless to say, the executive branch cannot change statutory text, and this Court is bound to follow the Seventh Circuit's interpretation of statutory text unless and until the Seventh Circuit says otherwise.  Also, the regulation was amended in 2012, and despite the change, the Seventh Circuit continues to use the same standard.  *See* 29 C.F.R. § 1630.2 (effective April 4, 2012).  That is, a plaintiff has to show that her condition "significantly restricted [her] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  *See Carothers v. County of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015) (citation omitted); *Kurowski v. Shinseki*, 557 F. App'x 549, 553 (7th Cir. 2014); *Povey v. City of Jeffersonville*, 697 F.3d 619, 623 (7th Cir. 2012).  Many district courts have followed suit.  *See, e.g.*, *Smith v. Union Pac. R.R.*, 2018 WL 1293228, at *9 (N.D. Ill. 2018) (Dow, J.); *Avet v. Dart*, 2016 WL 757961, at *4 (N.D. Ill. 2016) (Pallmeyer, J.); *Stermer v. Caterpillar Inc.*, 102 F. Supp. 3d 959, 966 (N.D. Ill. 2015) (Norgle, J.).  That phraseology may not appear in the regulation itself, but the accompanying Appendix to the regulation does continue to use that phrase.  *See* 29 C.F.R. § 1630 Appendix ("In the rare cases where an individual has a need to demonstrate that an impairment substantially limits him or her in working, the individual can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities."); *see generally id.* (explaining the change in language).  Finally, the CTA invoked that standard (meaning the "class of jobs or a broad range of jobs in various classes") in its brief, and Frazier-Hill never argued that any different standard applies (except to say that it does not apply to *other* types of major life activities, like reaching and lifting), so any such argument is waived.  *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 6 (Dckt. No. 147); *see also* Pl.'s Reply in Supp. of Mtn. for Summ. J., at 3–4 (Dckt. No. 161).

injury must limit employment generally, not merely preclude an employee from a particular job or a narrow range of jobs." *Delgado*, 282 F. App'x at 460; *EEOC v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1018 (7th Cir. 2001) ("Mere proof that an impairment prevented an individual from performing a particular job for a particular employer is insufficient to render him or her 'disabled' under the ADA."). "Demonstrating a substantial limitation in performing the *unique aspects of a single specific job* is not sufficient to establish that a person is substantially limited in the major life activity of working." *See* 29 C.F.R. § 1630 Appendix (emphasis added).

Frazier-Hill presented evidence that her carpal tunnel prevented her from driving 60-foot articulated buses. She points to a 2016 occupational therapy report, stating that she had difficulty driving independently, and many notes from Dr. Mejia between 2016 and 2018, which restricted her from driving articulated buses. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 167); Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 51 (Dckt. No. 165); April 2018 Concurrent Disability and Medical Leave Statement (Dckt. No. 165-5, at 4 of 51).

That evidence did not demonstrate that Frazier-Hill could not drive buses. Instead, it addressed whether she could drive a subset of buses: 60-foot articulated buses. On its face, the evidence does not show that she was restricted from "a class of jobs or broad range of jobs" as compared to the average person. *Delgado*, 282 F. App'x at 460. Her injury did not "limit employment *generally*." *Id.* (emphasis added).

In fact, Frazier-Hill *wanted* to continue driving. But she wanted to drive only 40-foot buses. Dr. Mejia's notes and Frazier-Hill's accommodation requests restrict driving articulated buses, so that *she can drive* 40-foot buses. *See, e.g.*, April 2018 Request for Reasonable Accommodation (Dckt. No. 159-4, at 14 of 38) (stating that "I can do my job. Requesting for a reasonable accommodation to drive standard buses"); April 2018 Concurrent Disability and

24

Medical Leave Statement (Dckt. No. 165-5, at 4 of 51) (stating that Frazier-Hill "may not drive articulating bus" but that she "can drove [sic] standard bus"); 10/27/2016 Work Status Report (Dckt. No. 164-2, at 3 of 22) (stating that "Patient may return to work with restriction of driving non-articulated buses only"). Frazier-Hill even argues that "she can perform the essential functions of the job" for 40-foot buses: operating "a bus over an established route adhering to predetermined schedule in a safe, efficient, and courteous manner . . . ." *See* Pl.'s Mem. in Support of Mtn. for Summ. J., at 5 (Dckt. No. 132-1).

Frazier-Hill did not present evidence that carpal tunnel limited her ability to work. She presented evidence that carpel tunnel limited her ability to drive a longer bus, but not a shorter bus. An injury that limits the ability to drive some buses but not others is not enough to give rise to a claim. That injury covered the "unique aspects of a single specific job," not employment more generally. *See* 29 C.F.R. § 1630 Appendix; *Delgado*, 282 F. App'x at 460; *see also Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009) ("'[A]n inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally.'") (citation omitted).

The Seventh Circuit reached the same conclusion in *Powers v. USF Holland, Inc.*, 667 F.3d 815 (7th Cir. 2011), a case not cited by the parties. That case, like the case at hand, involved a driver who wanted to switch vehicles for medical reasons.

The plaintiff in *Powers* worked as a long-haul truck driver, but he switched to driving a city route. *Id.* at 816. Before long, he started having back problems, so he asked to switch again and return to long-haul driving, for medical reasons. *Id.* The company declined the request, so the driver filed suit under the ADA.

The Seventh Circuit concluded that the driver "is not substantially limited in the major life activity of working because he is capable of long-haul driving." *Id.* at 817. The Seventh Circuit drew attention to the fact that the "evidence in this case is insufficient to show that Powers is unable to drive trucks." *Id.* at 821. An inability to drive certain *types* of trucks was not enough. "[T]o prevail on a claim that he is substantially impaired in the major life activity of working, a plaintiff must present evidence that, if believed, would support the conclusion that he is unable to work as a truck driver in general. Merely being unable to work as a specific type of truck driver, or for a specific employer, is not enough." *Id.* at 822.

There was "no evidence in the record that Powers's impairment prevents him from working as a truck driver in general." *Id*. at 822. So the driver was not "actually impaired in the major life activity of working." *Id.* at 822–23; *see also Baulos v. Roadway Express, Inc.*, 139 F.3d 1147, 1153 (7th Cir. 1998) (holding that truck drivers were not disabled within the meaning of the ADA because their inability to drive sleeper trucks did not "disqualify them from a similar class of truck driving jobs that do not include sleeper duty").

So too here. Frazier-Hill presented evidence that her medical condition limited her ability to drive 60-foot articulated buses. But there is no evidence in the record that she cannot drive buses more generally. In fact, Frazier-Hill concedes that she can drive 40-foot buses. That concession means that her condition does not substantially limit the major life activity of working.

Second, Frazier-Hill argues that her carpal tunnel substantially limits the major life activity of reaching. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 4 (Dckt. No. 163). But none of Frazier-Hill's evidence shows that she was limited in reaching. Indeed, none of Frazier-Hill's accommodation requests ask for a reaching accommodation. None of Dr. Mejia's notes mention

difficulty reaching. The notes mention pain, even difficulty sleeping, but not reaching. And neither of her occupational therapy reports says anything about reaching. They mention other tasks that Frazier-Hill is having difficulty with – using a computer, writing, opening a tight jar, and so on – but not reaching. *See* 2016 Occupational Therapy Report (Dckt. No. 132-4, at 9 of 69); 2018 Occupational Therapy Report (Dckt. No. 132-4, at 15 of 69).

Maybe there's some mention of reaching elsewhere in the record. But if so, Frazier-Hill hasn't pointed it out, and this Court has no duty to hunt and peck to find it. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Third, Frazier-Hill argues that her carpal tunnel substantially limited the major life activity of lifting. For support, she again points to doctor's notes and occupational therapy reports. Specifically, she points to an occupational therapy report from April 2016, stating that Frazier-Hill was "having difficulty . . . carrying/lifting > 10 lbs." *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 167); *see also* 2016 Occupational Therapy Report (Dckt. No. 132-4, at 9 of 69).

A report from 2016 is not enough to support a finding by a reasonable jury that Frazier-Hill was disabled in 2018, when the CTA denied her requests. Again, "[c]ourts determine whether an individual has an ADA disability 'as of the time the employment decision was made.'" *Corrales*, 2021 WL 1978309, at *3 (quoting *Bay*, 212 F.3d at 974).

The question is whether Frazier-Hill was disabled in 2018, when she requested an accommodation. On this record, a report from 2016 is not enough to support an inference that she was disabled in 2018. A lot happened in the interim – including many medical

27

appointments, and surgery – and there is no evidence that any restrictions on lifting continued to exist in 2018.

In September 2016, Frazier-Hill's doctor (Dr. Mejia) stated that her carpal tunnel was "not very symptomatic." *See* 9/15/2016 Orthopedic Note (Dckt. No. 164-2, at 6 of 22). In October 2016, Dr. Mejia stated that her carpal tunnel was "asymptomatic," but "not resolved," while restricting Frazier-Hill from driving articulated buses. *See* 10/27/2016 Work Status Report (Dckt. No. 164-2, at 3 of 22). And in November 2016, Dr. Rolando Garces examined Frazier-Hill, and he cleared her to return to work without any medical restrictions. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 48 (Dckt. No. 165).

Most importantly, in 2017, Frazier-Hill had carpal tunnel surgery, which she admits improved her carpal tunnel. *Id.* at ¶ 50. None of her doctor's notes between 2016 and 2018 mentioned difficulty lifting.[11] The notes also did not place any restrictions on lifting, despite restricting her from driving articulated buses.

And importantly, an occupational therapist evaluated Frazier-Hill again in April 2018, the same month as her second 2018 accommodation request. *See* Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 164). This time, the occupational therapist stated that Frazier-Hill presented with "deficits in AROM [probably meaning Active Range of Motion] (end range composite grasping, strength, soft tissue restrictions." *Id.*; *see also* 2018 Occupational Therapy Report (Dckt. No. 132-4, at 15 of 69).[12] The deficits limited Frazier-Hill's "ability to complete

---

[11] In fact, the first time that Dr. Mejia even mentions a lifting restriction is in 2019, over a year after the CTA denied her third and fourth accommodation requests. *See* September 2019 Work Status Report (Dckt. No. 132-4, at 63 of 69). In August 2019, Dr. Mejia stated that Frazier-Hill is limited in "heavy lifting, strenuous activities, and driving articulating buses." *Id.* But this 2019 note is irrelevant to Frazier-Hill's limitations in 2018.

[12] As an aside, by way of feedback, the collections of exhibits by the parties were difficult to navigate, requiring this Court to spend an inordinate amount of time hunting for the exhibits in question. On ECF, the parties frequently named each attachment of exhibits as "Exhibit," which isn't particularly informative

the following essential B/IADLs [probably meaning Basic / Instrumental Activities of Daily Living]:  opening a tight jar, carrying a shopping bag, washing her back; using a knife to cut food."  *See* 2018 Occupational Therapy Report (Dckt. No. 132-4, at 15 of 69).

But unlike the first evaluation from April 2016, the April 2018 evaluation didn't mention difficulty lifting.  *Compare* 2016 Occupational Therapy Report (Dckt. No. 132-4, at 6 of 69) (stating that Frazier-Hill had difficulty "carrying/lifting > 10 lbs"), *with* 2018 Occupational Therapy Report (Dckt. No. 132-4, at 15 of 69) (including no mention of any problems with lifting).  The 2018 report did mention "deficits" that "limit" her ability to open a tight jar, carry a shopping bag, and use a knife to cut food.  *See* 2018 Occupational Therapy Report (Dckt. No. 132-4, at 15 of 69).  Those activities – opening, carrying, and cutting – involve grip strength.  There was no mention of any difficulty picking things up.

There is no evidence that her carpal tunnel limited her ability to lift when Frazier-Hill made the accommodation requests in 2018.  There is evidence that her doctor restricted her from driving articulated buses, that she felt pain, and that she had difficulty with grip strength.  But nothing about her ability to lift.  Her 2016 occupational therapy report, completed two years

---

when searching for a *particular* exhibit.  *See, e.g.*, Defs.' Statement of Additional Facts (Dckt. No. 142); Defs.' Statement of Facts (Dckt. No. 146); Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 164); Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 3 (Dckt. No. 165).  All too often, the citations were too cryptic to allow the Court to find the exhibits without much searching.  For example, consider the following citation in paragraph two of Plaintiff's Statement of Additional Facts:  "SOAF App. Exh. 2, Dec. Exh. 2 – PSOF 19, App. Exh. 19."  *See* Pl.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 164).  As another example, consider the citation in paragraph four:  "SOAF App. Exh. 3, App. Exh. 13, Bates 445."  *Id.* at ¶ 4.  That citation required this Court to go to Docket Number 164-1 – one of *eleven* attachments, each called simply "Exhibit" – and then scroll down to page 17 of 22, which is "SOAF Appendix Exhibit 3," and then scroll down further to find Appendix Exhibit 13 *within* SOAF Appendix Exhibit 3.  And sometimes the Court could not find the cited exhibit where the parties said it should be.  For example, paragraph 5 of Plaintiff's Response to Defendants' Statement of Facts tells the Court to look at Supplemental Appendix Exhibit 1 for Frazier-Hill's Deposition and Declaration.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 162).  But when the Court looked at Supplemental Appendix Exhibit 1, there was nothing there.  *See* Supplemental Appendix Exhibit 1 (Dckt. No. 162-1, at 2 of 27).  Since Plaintiff's attached Frazier-Hill's declaration as "Declaration" to docket number 161, the Court found it after some hunting.

before the requests and before her surgery, is not evidence of her limitations at the time of her 2018 requests given her later medical history and records.

The rest of Frazier-Hill's arguments don't move the needle.

She generally points to Dr. Mejia's many notes stating that Frazier-Hill has carpal tunnel syndrome, and to parts of those notes identifying carpal tunnel as "a disability." Frazier-Hill argues that since the CTA and Hampton did not dispute her diagnosis or medical records, she is disabled.

But the existence of a medical condition, on its own, does not establish a disability. *See, e.g.*, *Fleishman*, 698 F.3d at 607. Frazier-Hill must show the effect of carpal tunnel on her major life activities, not merely the diagnosis. *Id.* And a form referring to a condition as a disability does not mean that the employee is disabled within the meaning of the ADA. It doesn't matter whether the CTA and Hampton disputed her medical history. What matters is whether Frazier-Hill presented evidence that her carpal tunnel substantially limited a major life activity.

Frazier-Hill also argues that the pain in her wrists caused her to stop driving buses in April 2016. But Frazier-Hill went back to driving buses. And in her 2018 accommodation requests, she asserted that she could drive 40-foot buses.

Finally, Frazier-Hill argues that her status in the CTA's Temporary Medical Disability – Area 605 program supports that she is disabled. Area 605 is a designation for employees on temporary medical disability leave, such as when an injury or illness leaves an employee unable to perform the essential functions of their job. *See Arce v. Chicago Transit Auth.*, 193 F. Supp. 3d 875, 880 (N.D. Ill. 2016), *aff'd*, 738 F. App'x 355 (7th Cir. 2018). And just as a diagnosis does not mean an employee is disabled, being placed in Area 605 does not mean the employee is disabled within the meaning of the ADA. *See Richardson v. Chicago Transit Auth.*, 926 F.3d

30

881, 884–94 (7th Cir. 2019) (finding that a severely obese bus operator placed in Area 605, and ultimately administratively separated, was not "disabled" under the ADA).[13]

Maybe Frazier-Hill was limited in other life activities. She couldn't open jars, wash her back, and hold knives. But Frazier-Hill doesn't make those arguments, so they are waived.

Ultimately, Frazier-Hill has the burden of showing that her carpal tunnel substantially limited one or more major life activities. She provides arguments for three activities – working, reaching, and lifting. But she fails to provide any evidence that in 2018, when she made her accommodation requests, her carpal tunnel limited any of these activities.

In sum, Frazier-Hill has not come forward with sufficient evidence that she had a disability within the meaning of the ADA at the relevant time, so she cannot get to trial on a failure to accommodate claim. Without a viable failure to accommodate claim, she cannot proceed on her theory about the lack of an interactive process. Any claim of a breakdown "of the interactive process must [] be ancillary to any ADA claim and is not an ADA claim unto itself." *Igasaki v. Illinois Dep't of Fin. & Prof'l Reg.*, 988 F.3d 948, 961 (7th Cir. 2021). There is no independent cause of action for a breakdown of the interactive process. *Id.*

Defendant's motion for summary judgment on Count I is granted, and Frazier-Hill's motion for summary judgment on Count I is denied.

## II.     Equal Protection

Frazier-Hill also brings an equal protection claim against Georgette Hampton as an individual defendant under 42 U.S.C. § 1983. Frazier-Hill argues that the CTA deprived her of

---

[13]   Additionally, as instructed by Frazier-Hill, this Court need not consider whether placement in Area 605, or any other evidence, supports that Frazier-Hill was "regarded as" disabled. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 4 (Dckt. No. 163).

equal protection under the Fourteenth Amendment by denying her request for an accommodation.

The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." *See* U.S. Const. amend. XIV, § 1. The Equal Protection Clause prohibits state and local governments from discriminating on the basis of certain protected classifications, and from irrationally targeting an individual for discriminatory treatment as a so-called "class of one." *See Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010).

Frazier-Hill doesn't exactly explain which equal protection route she is taking. She claims that the CTA deprived her of her rights when it denied her accommodation requests, while the CTA gave accommodations to *other* disabled bus drivers. *See* Fourth Am. Cplt., at ¶¶ 48–52 (Dckt. No. 125).

Her equal protection claim seems to be a "class of one" claim. The "class of one" theory of equal protection "presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review." *See Engquist v. Or. Dep't of Ag.*, 553 U.S. 591, 605 (2008). In Frazier-Hill's case, she claims that she was singled out and treated differently than other disabled drivers.

But the "class of one" theory of equal protection does not apply in the public employment context. *Id.* "[T]he class-of-one theory of equal protection – which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review – is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns." *Id.* So, if Frazier-Hill is bringing a "class of one" claim, it fails.

32

Maybe she isn't claiming a "class of one." Maybe, instead, she is arguing that the CTA discriminated against her based on her disability (putting aside whether Frazier-Hill is disabled within the meaning of the ADA). Even though "class of one" claims do not apply in the public employment context, the Equal Protection Clause continues to apply to public employers who treat classes of employees differently. *Id.*

Being disabled is not a suspect classification for equal protection purposes. "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational. They could quite hardheadedly – and perhaps hardheartedly – hold to job-qualification requirements which do not make allowance for the disabled. If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367–68 (2001).

Where (as here) the alleged classification is based on a disability, courts apply a rational-basis standard of review to equal protection claims. *Id.*; *Arce*, 193 F. Supp. 3d at 893–94 (adopting rational basis review when evaluating an equal protection claim under section 1983 against the CTA).

To get to trial, Frazier-Hill must present evidence that (1) Hampton treated her differently from others who were similarly situated; (2) Hampton intentionally treated her differently because of her membership in the class (*i.e.*, disabled persons); and (3) because the disabled do not enjoy any heightened protection under the Constitution, that the discriminatory intent was not rationally related to a legitimate state interest. *See Holmes v. Godinez*, 311 F.R.D. 177, 237 (N.D. Ill. 2015); *see also Smith v. City of Chicago*, 457 F.3d 643, 650–51 (7th Cir. 2006).

But Frazier-Hill runs into trouble on a class-based theory, too:  she failed to prove that she was treated differently because of her membership in a class (*i.e.*, disability).  In fact, Frazier-Hill's claim does not seem to involve a class-based theory.  Typically, in a class-based theory, a plaintiff alleges that he or she was treated differently than people *outside* the class – that is, treated differently than non-disabled persons because of a disability.  *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985); *Cowart v. City of Eau Claire*, 571 F. Supp. 2d 1005, 1013 (W.D. Wis. 2008).  But Frazier-Hill is arguing Hampton treated her differently than other disabled drivers.

Frazier-Hill's whole argument is that Hampton offered a bus servicer position to "disabled bus operators," but did not offer that position to Frazier-Hill.  *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 10 (Dckt. No. 163).  This evidence does nothing to prove that Hampton treated Frazier-Hill differently because of her disability.  According to Frazier-Hill, the other bus drivers were disabled, too.  *Id.*

At best, Frazier-Hill produced evidence that Hampton treated Frazier-Hill differently than other disabled drivers.  That is ultimately a "class of one" claim.  And as explained above, "class of one" claims do not apply in public employment.

Thus, Frazier-Hill failed to come forward with sufficient evidence to get to a trial on the equal protection claim.  Defendant's motion for summary judgment on Count II is granted.

### III.    *Daubert* Motion

The parties spend much of their briefs arguing about whether 40-foot buses and 60-foot articulated buses are the same.  Defendants produced an expert to support their argument, and Frazier-Hill responded with her rebuttal expert, Dr. Kimberly Mercurio.

In response, Defendants moved to strike Dr. Mercurio's report and bar her testimony. *See* Defs.' Mtn. to Strike Report & Rebuttal Expert (Dckt. No. 153). Defendants called into question Dr. Mercurio's qualifications and methodology. *Id.*

This Court resolved the summary judgment motions, without needing to get into the admissibility of Dr. Mercurio's testimony. As a result, Defendants' motion to strike Dr. Mercurio's report and bar her rebuttal testimony is denied as moot.

## Conclusion

Plaintiff's motion for partial summary judgment is denied. Defendants' motion for summary judgment is granted. Defendants' motion to strike the expert report and bar the rebuttal expert testimony is denied as moot.

Date: March 15, 2022

_____

Steven C. Seeger
United States District Judge